**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SUPERIOR PONTIAC BUICK GMC, INC., a Delaware corporation, d/b/a SUPERIOR NISSAN and WALTER J. SCHWARTZ,

        Plaintiffs,

v.

NISSAN NORTH AMERICA, INC., a California corporation,

        Defendant.

                                      /

CASE NO. 08-10642

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court is Defendant Nissan North America, Inc.'s ("Nissan") Motion for Partial Summary Judgment. (Doc. 47). The Court heard oral argument on February 3, 2011, and at the conclusion of the hearing took this matter under advisement. For the reasons that follow the motion is **GRANTED in part and DENIED in part**.

**I.  STATEMENT OF FACTS**

In their complaint, Plaintiffs Superior Pontiac Buick GMC, Inc. ("Superior) and Walter Schwartz (collectively "Superior") allege that Nissan committed various illegal acts during the course of the parties' dealings and through Nissan's eventual termination of the parties' sales and service agreement. (Doc. 1.) The parties' relationship is longstanding; in January 2001, they entered into a term agreement, the Nissan Dealer Term Sales & Service Agreement (term agreement), which expired on June 30, 2002.

On March 10, 2003, Superior and Nissan executed a Nissan Dealer Sales & Service Agreement (Dealer Agreement), which governs their relationship. (Doc. No. 47, Ex. D.) Schwartz signed the Dealer Agreement in his capacity as the Principal Owner of Superior. (Id.)

Throughout their relationship, Superior's Primary Market Area (PMA) increased. PMA includes the geographical territory for which a dealer is charged with the primary responsibility of making vehicle sales. In 2003, Superior's sales were poor, and in 2004, they fell to the lowest sales penetration ranking in the North Central Region, Michigan, and the District. In 2005, Superior was ranked next to last in the North Central region. (Doc. No. 47, Ex. I.)

Based on the performance, Nissan issued Superior a Notice of Default (NOD) on September 6, 2005. (Doc. No. 47, Ex. J.) Superior had 180 days to improve its sales performance or face termination of the franchise. (Id.) Superior denied that it was in default and maintained that its sales were adequate. In August 2006, Nissan agreed to extend Superior's cure period another 180 days. (Doc. No. 47, Ex. K.) Superior's sales had improved apart from a recent dropoff, and it believed its sales were good given the large number of Ford employees in the area. Nissan did not endorse this position.

In 2006, Nissan initiated a study of the Detroit market. In March 2007, Nissan reviewed the results and determined that Superior would benefit if it relocated. (Doc. No. 47, Ex. M.) Nissan informed Superior in April 2007, that if Superior elected to sell or transfer the dealership, Nissan had to approve the sale and could base approval on the buyer's commitment to relocate the dealership. (Doc. No. 47, Ex. N; Doc. No. 52, Ex. 3.)

On December 4, 2007, Nissan issued Superior a Notice of Termination because Superior had "unsatisfactory sales penetration performance." (Doc. No. 47, Ex. O.) Plaintiffs filed this lawsuit two months later, in February 2008. Underlying the claims alleged in their complaint, is Plaintiffs' contention that they never received enough inventory to succeed.

Specifically, when Superior purchased the Nissan franchise, it purchased the existing inventory of thirty-six vehicles. Superior believed that Nissan would provide it with an "opening allocation" of vehicles as detailed in the new dealer literature. (Doc. No. 52, Ex. 4, Nissan Sales Distribution Polices and Procedures.) Schwartz asserts that other dealerships were given opening allocations, and one dealership's was so large, Superior purchased some of its vehicles. (Id.) Further, according to Plaintiffs, the opening allocation is important because it begins the "turn and earn" system by which Nissan supplied vehicles based on the dealer's sales. Schwartz asserts that without inventory, Superior could not increase sales, and Superior was chronically undersupplied. (Doc. No. 52, Ex. 5.)

Supply was addressed in the parties agreements, and without question, the parties understood that:

> numerous factors [ ] affect the availability of Nissan Vehicles. . .including, without limitation, production capacity, sales potential in Dealer's and other Primary Market Areas, varying consumer demand, weather and transportation conditions, and state and federal government requirements. Since such factors may affect individual dealers differently, Seller reserves to itself sole discretion to distribute Nissan Vehicles in a fair and consistent manner, and its decision in such matters shall be final.

(Doc. No. 47, Ex. B, § 7.A.1.)

In their complaint, Plaintiffs seek to enjoin the termination of the franchise and seek damages for violations of the federal Automobile Dealer Day in Court Act, 15 U.S.C. §1221, et seq. (ADDCA), the Michigan Motor Vehicle Dealers Act, MICH. COMP. LAWS § 445.1561 et seq. (MMVDA), breach of contract, and tortious interference with a business relationship. Plaintiffs' claims arise out of their assertion that Nissan failed to exercise good faith in its dealings with Superior and imposed unreasonable and unobtainable performance standards thereby undermining Superior's sales performance and justifying termination.

## II. STANDARD OF REVIEW

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In other words, the movant must show that it would prevail on the issue even if all factual disputes are conceded to the nonmovant. Additionally, for the purposes of deciding on a motion for summary judgment, a court must draw all inferences from those facts in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. ANALYSIS

Nissan asks the Court to dismiss all claims asserted by Plaintiff Schwartz individually. It also asks the Court to dismiss the request for punitive damages, to apply

the doctrine of laches or to limit claims based on the respective statute of limitations, to dismiss any allegation of harm arising from Nissan's reservation of the right to approve any dealership sale, to dismiss the tortious interference claim, and to dismiss any claim of coercion or intimidation by Nissan arising out of the decision to terminate Superior for poor sales performance. The Court discusses the merits below.

### A. Schwartz's Status

The parties agree that Schwartz signed the Dealer Agreement in his capacity as an officer of Superior, and that he is the principal owner of Superior. They disagree as to the import of his signature on the parties' agreements.

Under long established law, even a sole stockholder cannot maintain an action to redress injuries to a corporation. Canderm Pharmacal, Ltd. v. Elder Pharaceuticals, Inc., 862 F.2d 597, 603 (6th Cir. 1988) (citation omitted). Notably, in Canderm Pharmacal, the appellate court noted that even a contract conditioned on the continued involvement of the president with the corporation, did not establish a basis for an exception to the rule. Id. Nevertheless, if an individual can show a violation of a duty owed directly to him, he may pursue an action on his own behalf. See Gaff v. FDIC, 814 F.2d 311, 315 (6th Cir. 1987). Accordingly, the resolution of this dispute turns on whether Schwartz can establish a violation of a duty owed directly to him.

Plaintiffs assert that there was a violation of a duty owed directly to Schwartz because the Dealer Agreement indicates that it is a personal services agreement entered into by Nissan in reliance upon Schwartz individually. The Agreement defines the principal owner as the person "upon whose personal qualifications, expertise, reputation, integrity, experience, ability and representations concerning the management and operation of

5

Dealer, Seller has relied in entering the Agreement." (Doc. No. 52, Ex. 23, Sec. 1(O).) Further, the owner is prohibited from assigning the rights and privileges conferred upon him. Plaintiffs assert that these provisions distinguish this case from those invoking the general rule that a corporation is separate and distinct from its shareholders.

The Court disagrees. Nissan's contractual obligations were to Superior, not Schwartz. (See Doc. No. 47, Exs. B and D.) Here, there is no "separate and distinct" injury to Schwartz that could support an individual recovery. To the contrary, any injury he suffered is inextricably intertwined with, or derivative of, any injury suffered by Superior. Further, the statutory claims do not authorize damages to an individual in Schwartz's position. See Caruana v. Gen. Motors Corp., No. 05-5458, 2006 WL 2873178 (6th Cir. Oct. 5, 2006) (holding that a dealer principal lacked standing under the DDCA despite contractual reference to his personal involvement in the dealership or status as sole shareholder); MICH. COMP. LAWS § 445.1562(2). Accordingly, the Court finds Schwartz lacks standing to pursue claims individually.

### B. AVAILABILITY OF PUNITIVE DAMAGES

Plaintiffs seek punitive damages. Neither California nor Michigan law allows punitive damages for a breach of contract claim. See Quigley v. Pet, Inc., 208 Cal. Rptr. 394 (Cal. Ct. App. 1984); Fellows v. Superior Products Co., 506 N.W.2d 534 (Mich. Ct. App. 1993). Further, punitive damages are not available under the MMVDA or the Dealer Day in Court Act. In Laverly et al., v. Nissan North America, No. 03-1005, 2004 WL 1041604 at *6 (6th Cir. May 4, 2004), the court held as follows:

> Michigan law prohibits the recovery of punitive damages (or exemplary damages, as Michigan labels them) for a statutory claim unless the statute itself authorizes the damages. See B & B Inv. Group v. Gitler, 229 Mich.

App. 1, 581 N.W.2d 17, 21 (1998) ("[W]here a cause of action is statutorily based, there must be a basis in the statute for awarding exemplary damages, i.e., either an express provision or [ ] legislative history from which one could infer a legislative intent to provide such an unusual remedy.") (citation and quotation omitted).

Accordingly, the Court dismisses the request for punitive damages relative to the contractual claim and the statutory claims.

### C. LACHES

Next, Nissan asserts that Plaintiffs waited too long to bring their claims. The Court disagrees.

Under Michigan law, laches requires "a lack of due diligence on the part of the plaintiff resulting in some prejudice to the defendant." Gallagher v. Keefe, 591 N.W.2d 297, 300 (Mich. Ct. App. 1998); Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 320 (6th Cir. 2001). In the Sixth Circuit, there is a strong presumption that any delay by the plaintiff is reasonable provided the applicable state statute of limitations has not lapsed. Id.

This is not a situation where Plaintiffs' delay has misled Nissan "into acting on the assumption" that they abandoned their claim. See 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2946 at 117 (2d ed.1995) (quotation omitted). Nor have Plaintiffs acquiesced in Nissan's conduct. To the contrary, the parties' correspondence undermines any contention of abandonment. Nissan was aware of Superior's position that it needed more inventory and that the assessment of performance was arbitrary. Here, Plaintiffs had no incentive to file a lawsuit until they received the Notice of Termination. The Court therefore denies Nissan's request for summary judgment on its defense of laches.

### D. STATUTE OF LIMITATIONS

Because the contract at issue includes goods and services, the parties dispute how it should be characterized. According to Nissan, a dealership agreement is predominantly a sales agreement and subject to a four-year statute of limitations. In contrast, Plaintiffs maintain that the agreement is a personal services agreement, and subject to a six-year limitation period.

The Dealer Agreement establishes Superior as an authorized dealer for Nissan. Pursuant to Section 12C, the agreement " is a personal services agreement. . . ." (Doc. No. 47, Ex. B, Sect. 12C.) The Court finds the language is unambiguous. The parties entered into a personal service contract setting forth the rights and obligations of dealer relating to the sale and service of Nissan vehicles. They intended this contract to be for personal services, and it is subject to a six-year statute of limitations.

This determination is not undermined by case law cited to show that courts in other jurisdiction have applied the predominant effect test to motor vehicle dealership agreements, and concluded that dealership agreements are "predominantly for the sale of goods." American Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1386 (7th Cir. 1995); see also Paulson, Inc. v. Bromar, Inc., 775 F. Supp. 1329, 1333 (D. Hawaii 1991) (finding that sixteen jurisdictions have determined that the UCC applies to distributorship agreements). The Sixth Circuit is not one of those courts. In Wells v. 10-X Mfg. Co., 609 F.2d 248, 254-55 (6th Cir. 1979) (finding manufacturing agreement not sales contract based on analysis of Michigan law given the specific facts), the appellate court directed lower courts to consider all of the facts in assessing the nature of the Dealer Agreement.

Here, in addition to the contractual language, which clearly "bespeaks the intention" of the parties, Wells, 609 F.2d at 254, the Court observes that the parties are not in litigation over a claim of defective goods. Here, the challenge it to the sufficiency of Superior's performance of services.

Plaintiffs do not contest the applicable time limitation relative to their other causes of action. There is no dispute that as to the ADDCA and tortious interference claims, a three-year statute of limitations applies, and therefore any claim that accrued prior to February 14, 2005, is barred. In addition, the parties agree that the MMVDA claim is subject to a six-year statute of limitations. Therefore any claim accruing before February 14, 2002 is time-barred.

### E. CONDITIONAL APPROVAL FOR SALE OF THE DEALERSHIP

In support of several counts of their complaint, Plaintiffs challenge Nissan's right to condition approval of any dealership sale upon the buyer agreeing to relocate in accordance with the market study recommendations. They rely on Michigan law to support their theory. It prohibits a manufacturer from requiring a dealer to change the location of the dealership or making substantial alterations to the dealership premises if it would be unreasonable to do so. MICH. COMP. LAWS § 445.1574(g).

In asking the Court to dismiss any claim arising out of the approval provision, Nissan maintains that the approval issue is speculative. Nissan is correct that courts are not free to resolve hypothetical, conjectural matters. Abbott Labs v. Gardner, 387 U.S. 136, 149 (1967). Nevertheless, the Court finds Plaintiffs may advance their theory that the approval provision renders the dealership salesproof. Even if Superior has not presented any

9

purchase offer, and Nissan has not forced Superior to relocate, Plaintiffs' theory is that Nissan's desire for relocation of the dealership motivated the termination. Therefore, the Court declines to dismiss claims based on this theory

### F. TORTIOUS INTERFERENCE CLAIM

Count VII advances a claim of tortious interference. The parties do not specify whether California or Michigan law governs this claim. Nor do they articulate any difference between the two. Accordingly, the Court references Michigan law in its analysis.

To prevail on a claim of tortious interference, a plaintiff must show the existence of a valid business relationship or expectation of relationship between plaintiff and a third party, knowledge of that relationship or expectation by the defendant, and intentional interference by the defendant causing the termination of the relationship or expectancy, resulting in damage to the plaintiff. Dalley v. Dkema Gossett, PLLC, 788 N.W.2d 679 (Mich. Ct. App. 2010). In Formall, Inc. v. Cmty. Nat'l Bank of Pontiac, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988) (citation omitted), the state court elaborated on the third factor, noting that an allegation of "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another" was required.

Plaintiffs claim that Nissan interfered with prospective client relationships by setting criteria that would enable Nissan to categorize Superior as a poor performer, despite Superior's competitive performance. Further, Nissan failed to consider factors unique to Superior's performance. According to Plaintiffs, Nissan wanted Superior out of business in order to force relocation of the dealership.

Even if this conduct satisfies the element of unlawfulness or maliciousness, there has been no evidence presented by Plaintiffs that any relationship has been subjected to interference.  The Sixth Circuit has held that a franchisee has no business expectancy of future business relationships with customers developed during the franchise relationship.  Geib v. Amoco Oil Co., 29 F.3d 1050, 1061 (6th Cir. 1994).  In Geib, the plaintiff's franchise was not renewed after the defendant discovered that the plaintiff was manipulating reports.  Id. at 1052-1053.  The appellate court affirmed the dismissal of the plaintiff's claim of tortious interference with business relations, holding that an expectation of future dealings with former customers did not survive the termination of the franchise.  Id. at 1061-1062 (citing Michigan Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc., 438 N.W.2d 349 (Mich. Ct. App. 1989).  The reasoning is persuasive.  Accordingly, the Court dismisses the claim.

### G. ADDCA Claim

An automotive dealer may bring suit under the ADDCA against "any automobile manufacturer" for damages sustained as a result of a failure to act in good faith in terminating or canceling the franchise.  15 U.S.C. § 1222.  The Act defines good faith narrowly: it includes "freedom from coercion, intimidation, or threats of coercion or intimidation. . . ."  15 U.S.C. § 1221(e).  In the absence of coercion, intimidation, or threats thereof, there can be no recovery.  Fray Chevrolet Sales, Inc. v. GM Corp., 536 F.2d 683, 685 (6th Cir. 1976).  A mere lack of fairness will not satisfy the statute.  Id.

Because Nissan has advanced "an objectively valid reason for its actions," Plaintiffs cannot prevail without evidence of an ulterior motive."  Id.  "This is not to say, however, that a manufacturer who chooses to terminate a dealer can immunize itself from ADDCA liability

by simply pointing to a franchise agreement provision with which the dealer ostensibly failed to comply and assert that such provision was the basis for its severance of the franchise relationship." Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 326-27 (3d Cir. 2001). Evidence of coercion and intimidation can be inferred from conduct. Consequently, Nissan's insistence that Superior adhere to its franchise obligations may constitute a wrongful, sanction-backed demand, provided Plaintiffs can show Nissan was motivated by a pretextual, bad-faith reason.

The assessment of Nissan's good faith is ordinarily "a matter for factual weighing." Lavery, 2006 WL 1041604 at *5. After reviewing the evidence presented in the light most favorable to Plaintiffs, the Court finds a genuine issue of material fact exists. Plaintiffs' claim is not merely that Nissan's failed to supply it with high demand cars to force termination or that Nissan gave Plaintiffs only low demand cars. Plaintiffs' position is that Nissan applied the sales performance standards and allocation system in a way so as to create a pretext for termination. Correspondence dating back to June 2004, set the stage for the December 4, 2007, Notice of Termination. (See Doc. No. 52, Exs. 13-22.) Plaintiffs repeatedly explained unsatisfactory sales resulted from lack of inventory. In December 2006, Nissan informed Superior that it could not provide it more cars, and suggested that Superior buy from other dealers and brokers. In sum, Plaintiffs claim that Nissan withheld inventory thereby making it impossible to meet sales goals.

Here, viewed in the light most favorable to Plaintiffs, Nissan added the relocation "threat" after the Detroit metro market study in 2006-07. Although the Notice of Default occurred in September 2005 before the market study, Nissan granted extensions until the results of the market study. Therefore, although Superior's performance was at issue

before the recommendation to move the dealership, the decision to terminate was not. Nissan threatened the loss of the franchise if Superior did not sell more cars, but never supplied Superior with more cars to sell. Therefore, the Court denies summary judgment on this claim.

### H. MMVDA CLAIM

At issue in this claim is whether Nissan applied its allocation system in an arbitrary or capricious manner. Section 7 of the MMVDA, prohibits a manufacturer from adopting, changing, establishing or implementing an allocation and distribution system for new motor vehicle dealers that is "arbitrary or capricious or based on unreasonable sales and service standards." MICH. COMP. LAWS § 445.1574(1)(a)

Plaintiffs claim that Nissan violated its own Sales Distribution Policy and Procedures at the beginning of the relationship, by not providing the opening allocation of vehicles to Superior. Further, Nissan failed to consider that Superior operated in the shadow of Ford Motor Company World Headquarters. Most importantly, Nissan's complaints about sales performance were a pretext to avoid the statutory prohibition against forcing dealers to relocate or unseasonably withholding consent to a sale or unfairly preventing the dealer from receiving reasonable compensation for the value of his dealership. As evidence for this theory, Plaintiffs direct the Court's attention to the ever increasing PMA, which increased the number of cars Superior had to sell, regardless of the viability of the market or other unique market factors. (Doc. No. 52, Ex. 10.) Specifically, when Superior purchased the franchise in December 2000, its PMA abutted an open point, which was not occupied by a franchised dealer. Nissan increased Superior's PMA in August 2001, March 2004, and January 2006. (Doc No. 52, Ex. 11.) According to Plaintiffs, Nissan knew that

the increased area could not support a dealer, and continued to decline to provide additional cars despite the expanded PMA. In addition, Plaintiffs assert that Nissan dealers in the Detroit market collectively underperform, given the strong domestic influence.

In light of the evidence, the Court is satisfied that genuine issues of material fact require it to deny summary judgment on the claim that Nissan failed to exercise its discretion reasonably in establishing a vehicle allocation system.

## V. CONCLUSION

For the reasons stated, the Court **GRANTS in part and DENIES in part** Defendant's Motion. The Court dismisses Schwartz, the request for punitive damages, and the tortious interference claim. The Court denies the request for summary judgment on the doctrine of laches and the claims brought under the ADDCA and MMVDA. Finally, the Court finds the statute of limitations on the breach of contract claim is six years.

**IT IS SO ORDERED.**

                                              s/Marianne O. Battani
                                              MARIANNE O. BATTANI
                                              UNITED STATES DISTRICT JUDGE

Date: April 8, 2011

### CERTIFICATE OF SERVICE

Copies of this Order were mailed and/or electronically filed to counsel of record on this date.

                                              s/Bernadette M. Thebolt
                                              Case Manager