# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SUPERIOR PONTIAC BUICK GMC, INC., a
Delaware corporation, d/b/a SUPERIOR
NISSAN and WALTER J. SCHWARTZ,

CASE NO. 08-10642

HON. MARIANNE O. BATTANI

                Plaintiffs,

v.

NISSAN NORTH AMERICA, INC., a California
corporation,

                Defendant.

_____/

## OPINION AND ORDER

This matter came before the Court for a bench trial on September 7, 2011, and was

concluded on November 21, 2011.  In their complaint, Plaintiffs Superior Pontiac Buick

GMC, Inc. ("Superior) and Walter Schwartz (collectively "Superior") allege that Defendant

Nissan North America, Inc. ("Nissan") committed various illegal acts during the course of

the parties' dealings and through Nissan's eventual termination of the parties' sales and

service agreement.  (Compl., Doc. 1.)    In their complaint, Plaintiffs seek damages for

violations of the  the Michigan Motor Vehicle Dealers Act, Mich. Comp. Laws § 445.1561

et seq. (MMVDA), the federal Automobile Dealer Day in Court Act, 15 U.S.C. §1221, et

seq. (ADDCA), and for breach of contract.

In support of their relative positions, the Court received numerous documents,

including Plaintiffs' Exhibits P 3, P 14, P 19, P 33-P 50, P 52-66, P 69-P 76, P 79, P 92-P

94, P 103-P 116, P 118-P 122, P 125, P 131-P 140, P 142-P146, P 148-149, P 163-P 187,

and Defendants' Exhibits D 1-D 203, D 212-D 214, D 216-D 223, D 225-D 230, D 234, D

238- D 239, D 244-D 245, D 247-D 248A, D 249A, D 250A, D 251A, D 252A, D 253A, D 356, D 259-D 260, as well as the parties' closing arguments.

The bench trial was in session on September 7-9, 12-16, 19-21, November 15-18, and November 21, 2011.  During the course of trial, the Court heard testimony from Defendant's employees and former employees, Thomas Hushek, retired Regional Vice President of Nissan's North Central Region, Eric Anderson, successor to Hushek, Chad Kirchoff, Regional Sales Operations Manager for the North Central Region, from employees who acted as Dealer Operations Mangers (DOMs) during the parties' business relationship, William Shollenberger, Kevin Baumann, and Ray Madugno, and from Joseph Lavrencik, Distribution Manager of the North Central Region.  The Court heard testimony from Plaintiff Walter Schwartz and from Superior's employees, George Fowler, the General Manager of the Pontiac-Buick-GMC store, and Michael Cohen, who worked as the General Manager of new car sales.  In addition, Defendant offered expert testimony from Herbert Walker, regarding Plaintiffs' financial performance, and Sharif Farhat regarding Plaintiffs' dealer performance.  Plaintiff presented expert testimony from Ilhan Geckil, a profession economist, and David Rinker, a Certified Public Accountant.

In general, the Court found all the witnesses knowledgeable and credible.  Plaintiffs' witnesses advanced testimony to support Plaintiffs' view that Nissan failed to exercise good faith in its dealings with Superior and imposed unreasonable and unobtainable performance standards.  Defendant's witnesses offered testimony to support its view that Superior's sales performance was inadequate.

2

After considering all the evidence received and the legal arguments of the parties, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT

### A. Overview

Nissan distributes new motor vehicles, parts, and accessories throughout the United States to authorized Nissan dealers.  Superior has been a party to a sales and service agreement with Nissan since 2001.  Schwartz acquired the assets of Dearborn Pontiac Nissan from Bill Perkins for $3,500,000 through an Asset Purchase Agreement dated October 17, 2000.  (D 4).  The sale was conditioned on the approval and consent of General Motors and Nissan.  (Tr. 9/7/11 at 41).

Nissan consented, and the parties signed the Nissan Dealer Term Sales & Service Agreement (Term Agreement) on January 30, 2001.  (D 9).  It governed the parties' relationship until they signed the Nissan Dealer Sales and Service Agreement ("Dealer Agreement") on March 10, 2003.  (D 48).

Superior Pontiac is part of the Detroit Metro market, which is part of District 12, which, in turn, is part of the North Central Region.  The Detroit Metro market includes eight dealerships.

Nissan employs Dealer Operations Managers ("DOMs") to operate on its behalf in the field.  (Tr. 9/7/11 at 48-50).  DOMs are the contact between Nissan and its dealerships, and typically visit dealerships once or twice a month to review operations and provide assistance and recommendations.  (Id. at 50).  DOMS usually have eight to ten years of

industry experience.  (Id.)

DOMs create dealer contact reports summarizing their visits to a dealership.  (Tr. 9/9/11 at 91).   The contact reports are internal documents sent to the Nissan regional office in Illinois; they are not shared with the dealers.  (Tr. 9/12/11 at 13, 15, 83).

At the time Schwartz began operations, William Shollenberger was the DOM assigned to Superior, and he worked in that capacity until June 2003. (Tr. 9/9/11 at 72-3). Kevin Baumann subsequently became the DOM for District 12, and worked with Superior until Spring 2006.  (Tr. 9/13/11 at 58).  Ray Modugno succeeded Baumann and worked as the DOM for District 12 from August 2006 until April 2009.  (Tr. 9/21/11 at 43).

The DOMS all testified about shortcomings in Superior's performance, including poor sales, poor customer satisfaction, an outdated, poorly maintained facility, and untrained sales people.  (See e.g. D 54, D 55, D 57, D 83; Tr. 9/7/11 at 92, 96-98, 102-107, 131-132).  The DOMs acknowledged that Schwartz claimed lack of product caused his poor sales performance as well as a variety of other causes, including personnel (Tr. 9/12/11 at 95), focus on his GM business (Tr. 9/12/11 at 105), and road construction (D 81).

In 2003, Superior's sales were poor, and on September 26, 2003, Nissan issued a "poor performance" letter.  (D 58).  At that time, Superior's sales penetration was ranked 187 of 191 dealers in the North Central Region.  (D 58).  In 2004, its sales penetration fell to the lowest ranking in the North Central Region, Michigan, and the District.  (D 85).  It was ranked 187 of 187 dealers.  (Id.)  In 2005, Superior was ranked next-to-last in the North Central region.  (D 118).  In the summer of 2005, North Central Region management

4

conducted an in depth analysis of Superior's sales performance. (D 100). Nissan reviewed correspondence, contract reports and other business reports, and demographic information. (Id.; D 116). After completing the analysis, Hushek and Kirchhoff advanced a recommendation to national to issue a notice of default for unsatisfactory sales performance. (D 109).

Nissan adopted the recommendation and issued Superior a Notice of Default (NOD) on September 6, 2005. (D 109) Superior had 180 days to improve its sales performance or face termination of the franchise. (Id.) In response, Superior maintained that its sales had improved, but sales were hindered by road construction and the dealership location itself, which was near the situs of Ford fleet vehicles and leases. (D 115). These factors should have impacted Nissan's assessment of Superior's sales.

In April 2006, the North Central Region requested an extension to the Notice of Default. (D 133). In August 2006, Superior received notice that Nissan agreed to extend Superior's cure period another 180 days. (D 137). Nissan against extended the cure period 180 days in March 2007.

On December 4, 2007, Nissan issued Superior a Notice of Termination  because Superior had "unsatisfactory sales penetration performance." (D 184). Plaintiffs filed this lawsuit two months later, in February 2008. (D 214).

**B. Terms of the Governing Agreement**

Nissan and Superior entered into a Sales and Service Agreement on March 10, 2003. (D 48). The Dealer Agreement requires Superior to "actively and effectively promote through its own advertising and sales promotion activities the sale at retail. . .to

5

customers located within the Dealer's Primary Market Area (PMA)." (Id. at § 3.A)  A PMA is a group of census tracts assigned to a dealer, generally based upon the dealer's geographic proximity to the census tracts.  (Tr. 9/7/11 at 70).  Nissan assigns PMAs to its dealers to accommodate measurement of a dealer's performance and to assign a dealer responsibility for a distinct geographic territory in which to market and promote the Nissan brand.  (Tr. 9/7/11 at 71).  The Dealer Agreement reserved to Nissan the right to reevaluate PMA markets to account for changes in market conditions.  (D 48, § 4.A).

When the parties signed the Dealer Agreement, all of the 1990 Census Tracts that made up Superior's PMA were identified.  (D 48).  Superior's PMA, referred to as the Dearborn PMA, is the most populous in Metro Detroit.  (Tr. 11/15/11 at 69).  During the course of their relationship, Superior's Primary Market Area increased; however, the PMA identified since August 2001 included the Taylor/Southgate open point, which previously had been unassigned to any dealer.  (D 26).

Several provisions in the Dealer Agreement address evaluation of dealer performance.  Section 3.B of the Dealer Agreement authorizes Nissan to establish reasonable sales objectives as a percentage of registrations of Nissan cars and trucks, registrations of competitive vehicles, registrations of industry cars in the PMA, the district, or region.  (Id.)

In addition, because Superior is located in the Detroit metropolitan area, (Tr. 9/8/11 at 75), Section 3.C of the Dealer Agreement is relevant.  It provides that if a Dealer is located in a Metropolitan Market, "the combined sales performance of all Nissan Dealers in such metropolitan or other marketing area may be evaluated. . .and Dealer's sales

6

performance may also be evaluated on the basis of the proportion of sales and potential sales of Nissan Vehicles in the metropolitan or other marketing area in which Dealer is located for which Dealer fairly may be held responsible."  (D 48).

Finally, Section 3.D of the Dealer Agreement provides that, where appropriate, Nissan would consider other reasonable criteria.  Items identified include:

> the Dealership Location, the general shopping habits of the public in such market area, the availability of Nissan vehicles to Dealer and to other Authorized Nissan dealers, any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers, the recent and long term trends in Dealer's sales performance, the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers), and the other factors, if any, directly affecting Dealer's sales opportunities and performance.

(D 48).

The Dealer Agreement also establishes Nissan's right to terminate the agreement when its evaluations show that a dealer failed "to substantially fulfill its responsibilities with respect to . . .[s]ales of new Nissan vehicles and the other responsibilities" designated to a dealer in Section 3 of the Dealer Agreement.  (D 48 § 12.B).  The process requires Nissan to notify the dealer, review the nature and extent of the breach, and the reasons for the breach.  Further, Nissan is required to afford a dealer "a reasonable opportunity to correct the failure."  (D 48, § 12.B).  "If dealer fails to make substantial progress towards remedying such failure" in a given time, Nissan may terminated the Dealer Agreement. (Id.)

7

### C.  Evaluation Process

In 2005, before Nissan issued a Notice of Default, the North Central Region management reviewed Superior's sale performance reports, compared them to other benchmarks, and reviewed a local market analysis of the Ford influence in Superior's PMA. (Tr. 9/8/11 at 52).  Hushek and Kirchhoff both recommended the notice be issued.  (D 109; Tr. 9/7/11 at 130–32).  Nissan issued the written notice of material default on September 6, 2005, advising Superior that it was in material breach of Section 3 of the Dealer Agreement for failure to actively and effectively promote the sale of new Nissan vehicles in the Dearborn PMA.  (D 109).

> Nissan will no longer tolerate Dealer's substandard sales penetration performance.  In order to correct this Notice of Default, Nissan hereby requires Dealer to achieve at least regional average sales penetration of new Nissan Vehicles within one hundred and eighty (180) days from the date of receipt of this Notice of Default.  Failure to meet the regional average sales penetration will constitute a material breach of Dealer's Agreement and may result in Nissan issuing a Notice of Termination. . . .

(D 109 at 3)

The NOD identifies unsatisfactory sales penetration performance as the breach. Specifically, Superior's calendar year 2004 sales penetration of the combined Competitive Car and Truck Segment was 0.53%, representing only 14.05% of the North Central Regional Average sales penetration of 3.99%.  As a result of Superior's poor sales penetration performance, it ranked 185 out of the 186 Nissan dealers in the North Central Region.  Had Superior penetrated the market at 100% Regional Sales Effectiveness ("RSE"), which measures sales performance relative to other dealers in a defined region, it would have sold 1,609 vehicles during CY 2004.  (D 109).  Instead, Superior lost 1,383 sales for this same time period.  (Id.)  Moreover, as of June CYTD 2005, Superior's sales

8

penetration was .86%, which represented 19.98% RSE. (Id.) This performance translated to 749 lost sales through CYTD 2005. (D 109).

Nissan also included another reason in the NOD–Superior's failure to meet capitalization guides. Both parties offered testimony regarding the sufficiency of capitalization. Because this reason did not form the basis of the termination, the Court finds Superior either complied with its capitalization requirements or corrected any deficiencies.

The NOD could not have been a surprise to Superior inasmuch as Nissan had sent letters outlining serious concerns about sales penetration performance, DOMs had addressed Superior's ranking throughout 2005, and its decline in performance. (Id.). Although Superior emphasized Nissan's failure to place the dealership on a Performance Improvement Program ("PIP"), Hushek testified that PIPs were not used during the 2000-2006 time frame. (Tr. 9/8/11 at 6-10). Because Nissan was using far more experienced DOMs during that time, and the DOMs identified performance issues and offered recommendations for improvement, the DOMs acted akin to a PIP. Hushek also testified that the use of the DOMs, all of whom provided a consistent and unified approach as to how Superior could improve, rendered a formalized tracking report unnecessary. (Id.) It is uncontested that during the cure period, DOMs continued to work with Superior to improve its performance. For example, to assist Superior, Nissan provided it with its Edge Sales Process Booklet, priced at $15,000, free of charge. (D 112).

An August 11, 2006, certified letter gave Superior an extension despite Superior's failure to make any improvement in its sale performance as measured by RSE. (D 137). Nissan then engaged in a local market analysis that covered the 2003 through June 2006

9

time frame.  (D 136).  Nissan initiated this more formal study of the Detroit market to investigate Superior's assertion that Ford dominance in the Primary Market Area skewed its performance.  (Id.)  Nissan reviewed sales in a variety of ways, including Superior's performance when all Ford competitive registrations were eliminated and when all domestic competitive registrations were eliminated.  (D 136).  Even under these measurements, Superior's sales penetration remained less than half of the average of the Detroit Metro. (Id.)

On March 5, 2007, Schwartz received a second extension of the NOD Cure Period. (D 160).  In the certified letter, Nissan noted that Superior had failed to make any improvement in its sales performance and still was ranked last in the sate and last in the region.  (D 160).

On March 21, 2007, Nissan reviewed the results of the 2006-2007 market study and determined that Superior would benefit if it relocated.  (D 165).  Nissan reviewed the results with dealers in person.  (D 163; D 165).  Nissan subsequently  informed Superior, that if Superior elected to sell or transfer the dealership, Nissan had to approve the sale and could base approval on the buyer's commitment to relocate the dealership.  (D 165).

At a June 6, 2007, meeting, Schwartz again stated that Nissan had failed to provide Superior with an adequate supply of vehicles.  (D 168).  Nissan disagreed with Schwartz's explanation.   It attributed poor sales to other issues:   vehicle pricing, customer convenience, aged inventory, and failure to implement Nissan's Retail Environmental Design Initiative program (NREDI) to revitalize the Nissan brand and create a consistent, uniform retail experience for consumers.  (Tr. 9/9/11 at 134).

In a July 2007 DOM contact report, the issue of sales performance and lack of

improvement were raised with Schwartz.  (D 175).  Superior was ranked last in the state

and last in the region.  (Id.)  A July 2007 update of Superior's sales performance showed

it again lagged well behind other Metro dealers and the North Central Region.  (D 176).

Finally, on December 4, 2007, Nissan issued Superior a Notice of Termination.  (D

184).  In the Notice, Nissan stated that in the time following the NOD, "Dealer has not taken

necessary action to cure the substantial and material breach that led to the NOD.  The

reason for the termination was "Unsatisfactory Sales Penetration Performance."  (Id. at 2).

Overall, Superior's RSE declined from September 2005 to August 2007 from 19.32% to

16.64%.  (Tr. 9/14/11 at 120).  During the same time, the District 12 market share had

increased by close to 50%, and the Detroit Metro import market share had increased from

13% to 20%.  (Tr. 9/14/11 at 138).  The updated local market analysis showed that

Superior's sales performance had not improved even assuming a market devoid of

competitive Ford and competitive domestic registrations.  (D 176; Tr. 9/8/11 at 122-23).

Notably at the time, Superior had been on notice for more than two years that its sales

performance needed to improve.  The effective date of termination was March 10, 2008.

(D 184).

### D.  Method of Assessment

To assess Superior's performance, Nissan calculated Superior's sales penetration.

It measures the dealer's performance relative to an average.  (Tr. 9/16/11 at 199).

Specifically, Nissan assesses performance of Superior's sales relative to the performance

of other Nissan dealers in the North Central Region.  (Tr. 9/16/11 at 197).  The Regional

Sales Effectiveness or RSE shows how a dealer is penetrating its assigned PMA against

11

the average Nissan dealer in the region.  The average level of performance achieved by dealers in the region acts as a benchmark.  (Id. at 198).  Nissan calculates sales penetration for each of its dealers throughout the country in the exact same way.  (Tr. 9/16/11 at 203).  Many manufacturers use this measure.  (Id.)  In addition, Nissan ranks dealers against dealers within a particular state or district to gauge performance relative to a more localized peer group.  (Tr. 9/7/11 at 97-99).

Sales penetration is calculated using the ratio of a dealer's sales of new vehicles to the number of competitive registrations of new vehicles within the dealer's PMA. Competitive registrations include vehicles in segments in which Nissan competes.  (Tr. 9/7/11 at 93-94).   Nissan determines which vehicles fall into a segment based upon size, price, and utilities.  (Tr. 9/16/11 at 207-08). Nissan receives the information about auto sales from a data provider, R.L. Polk and Company ("Polk").  (Id.)  Polk breaks down the registrations by product segment, such as compact, subcompact, SUV, or pick-up truck. (Id. at 96; D 223, App 26).

Exhibit 225, A-89, which is reproduced below, shows Superior's sales penetration relative to District 12, Michigan, and the North Central Region for the years 2003-2007.

| YEAR | SUPERIOR | DETROIT (WITHOUT SUPERIOR) | DISTRICT 12 | MICHIGAN | NORTH CENTRAL REGION |
|------|----------|----------------------------|-------------|----------|----------------------|
| 2003 | O.7 % | 1.3% | 1.2% | 1.4% | 3.4% |
| 2004 | 0.5% | 1.7% | 1.5% | 1.7% | 4.8% |
| 2005 | 0.9% | 1.9% | 1.7% | 2.0% | 5.5% |
| 2006 | 0.7% | 1.5% | 1.4% | 1.7% | 5.3% |
| 2007 | 0.8% | 1.5% | 1.6% | 1.8% | 5.8% |

The chart shows that for each of the years the Dealer Agreement governed the relationship until the time the NOT was issued, Superior underperformed Metro Detroit, District 12, the State, and the Region. In most of the years, Superior's average was at most half of the other groups measured. For example, in 2007, Superior's sales penetration rate was 0.8%, and the North Central Region rate was 5.8%. (Id.) Superior fared no better when compared to the District rate which was 1.6% or the Michigan rate, which was 1.8%. (Id.) In sum, poor performance was not an anomaly. (Tr. 9/19/11 at 35).

Nissan applied this method of assessment across the board to its dealers. In addition, the method was applied as specified in the Dealer Agreement.

### 1. Reasonableness of the Method

Sharif Farhat, who is employed by Urban Science Applications, a consulting and software development company that uses science to answer business questions within the auto industry, testified as an expert on Nissan's behalf. (Tr. 9/16/11 at 173). Nissan asked Farhat to evaluate whether Superior was "actively and effectively" selling Nissan products and whether the requirements Nissan used to make that decision were reasonable or whether the performance was due to factors beyond its control. (Id. at 187).

13

Farhat concluded that "Nissan's methodology and [its] calculations are appropriate. They are the industry standard way of calculating expectation for dealers, and [Nissan's] process of not just calculating the number, but the ranking of the relative performance of dealers, is an appropriate method to make conclusions about. . .whether a dealer is active and effectively marketing Nissan products." (Tr. 9/19/11 at 38). The calculation placed Superior last in the region, state, and district. (Id. at 40). In reviewing the five calendar years, 2003-2007, low performance was a consistent issue. (Id. at 41).

Farhat testified that Nissan methodology comported with the industry standard way of calculating expectation for dealers and that ranking of the relative performance of dealers is an appropriate basis for concluding the effectiveness of a dealer. (Tr. 9/19/11 at 38). Farhat concluded that because the majority of dealers in the North Central Region had sale penetration above the region average, the benchmark is reasonable. (Id. at 28). The number of sales needed was not "overwhelming." (Id.) Nevertheless, none of the Metro Eight were above the regional average. (Id.)

Superior retained Ilhan Geckil, an economist, to analyze its sales performance. (Tr. 11/15/11 at 40-41), and Geckil concluded that the sales criteria employed by Nissan was unfair. To reach RSE, Superior had to sell 1,753 vehicles in 2005, 1,768 vehicles in 2006, and 1,809 vehicles in 2007. (Tr. 9/21/11 at 18). He added that the expectation that Superior should sell more than 1,000 cars in a given year is unreasonable. (Tr. 11/15/11 at 45; 9/21/11 at 18). To the extent that Superior could not sell the number of vehicles necessary to achieve RSE, the Dealer Agreement only required "substantial improvement." In this case, Superior showed no improvement whatsoever.

14

To assess Superior's performance, Geckil looked at Superior's raw sales. Geckil relied on compound sales growth to measure Superior's sales performance. Superior experienced 2.6% compound annual sales growth between 2003 and 2007. (P 169). However, Geckil's testimony did not address the fact that other Michigan Nissan dealers, on average, experienced 3.1% compound sales growth during the same period. (D 260; Tr. 11/22/11 at 113). His analysis failed to offer a basis for relative comparison of dealer performance in a metro area, and his contention that every market is unique does not afford a manufacturer any metric for determining which dealers are effective. Further, an analysis of raw sales ignores the opportunity available to dealers in different sized markets. (Tr. 9/19/11 at 117). For example, five sales in a small market is not the same as five sales in a market one hundred times bigger. (Tr. 9/7/11 at 97-98). Consequently, a manufacturer's failure to assess raw sales as a performance metric is not unreasonable. (Tr. 9/19/11 at 117).

The Court finds that Superior's failure to ever reach RSE, does not compromise the reasonableness of the goal. Nissan used RSE as a performance metric to assess the effectiveness of dealer sales relative to other dealers, and the fact that reaching RSE merely rendered a dealer average does not undercut the reasonableness of the metric. RSE merely constituted the standard by which the industry measured dealer performance. In fact, Schwartz conceded that GM used the same measure, and that it was calculated in the same way. (Tr. 11/18/11 at 87).

Because the Dealer Agreement specified that other reasonable considerations

15

would be factored into performance evaluation, the Court, as finder of fact, examines evidence regarding whether Nissan's assessment was reasonable in light of other criteria listed in the Dealer Agreement that might guide the analysis.

### 2. Factors Beyond a Dealer's Control

The parties offered evidence on several factors over which a dealer has no control, including assigned PMA, demographics, the influence of the domestic automotive market, and road construction.  The Court's findings on each follow.

#### i. PMA

To the extent the PMA is improperly defined, it is an issue beyond the dealer's control.  Nissan, not the dealer, determines the size of the PMA geographically.

In 2001, when Nissan conducted a market study, there was an open point in the Taylor-Southgate Area.  (Tr. 9/7/11 at 65).  An open point is a series of census tracts where there is no existing dealer.  The prior Nissan dealer in the Taylor-Southgate area was terminated in 1988.  (Tr. 9/14/11 at 23-24; P 142).  After the 2001 market study,  Nissan decided to close an "open point" located south of Superior, in Southgate/Taylor, Michigan, and  the geography associated with the open point went to surrounding Nissan dealers, including Dick Scott Nissan (Canton), Gerwick Nissan (Monroe) and Superior.   (Tr. 9/7/11 at 66, 74-75).

The open point encompasses Wayne County, which has the lowest penetration by import vehicles among Wayne, Oakland, and Macomb counties.  In contrast, Oakland County is the most import friendly among the three counties because of its population of higher educated people with higher incomes.

16

Even if the PMA expansion to the south of the dealership's location was less favorable than a PMA expansion to the north into the more import-friendly suburbs, (Tr. 11/15/11 at 63), there is no evidence that the expansion occurred for any reason other than in the ordinary course of business. Nor was the expansion contrary to industry practice. Nissan made changes to PMAs based on changes in dealer network planning and configuration and census changes, which occur every ten years. (Tr. 9/7/11 at 74). Further, the fact that normalizing by restoring Superior's original PMA before the elimination of the Southgate-Taylor open point would, at a minimum, double Superior's sales effectiveness, (Tr. 11/17/11 at 28), it is not persuasive evidence that the expansion was unreasonable. The same would be true for any dealership if its PMA were cut in half because it would reduce the number of units required to reach regional average sales penetration. (Tr. 9/20/11 at 83; 9/14/11 at 61).

Superior's PMA was properly assigned based on the air distance, drive distance, and driving time. There is no evidence that Nissan assigned the census tracts to Superior in an unusual or atypical fashion. In fact, Superior was closer to each of the newly assigned census tracts than any other Nissan dealer. Superior's PMA was fourth smallest in terms of square miles. (Tr. 9/21/11 at 19). Its PMA included the open point when it signed the Dealer Agreement in 2003; its PMA was not altered after the NOD issued, after the extensions of the cure period, or after the NOT.

Similarly, there was no evidence presented to show that Nissan assigned Superior a PMA with a large population for a reason outside the normal course of business. Superior's location, in a metropolitan market required it to serve a very large population.

17

Superior is one of eight Nissan dealers in the Detroit Metro market, a market having more than four million people.  Because of its PMA assignment, Superior serves one-fourth of the Detroit Metro market area, approximately 25% of the population and households, in an area that does not have a strong demand for import vehicles.  (Tr. 11/15/11 at 62). Because PMA is used in calculating a dealer's sales performance the assignment is important.  (Tr. 9/16/11 at 198).

Nissan viewed the size of the PMA as offering a "significant opportunity relative to other PMAs within the state and in the Detroit market" based upon the number of competitive registrations in the Dearborn PMA. (Tr. 9/21/11 at 24).  There was no evidence presented that PMA among metropolitan dealers typically is allotted to equalize population, and the Court rejects Plaintiff's position that because there are eight Nissan dealers in the Detroit Metro area, Superior Nissan should service approximately one-eighth of the population, the size of the population before the PMA expanded.  (Tr. 11/15/11 at 81). PMAs are assigned based on physical proximity, not based on population.

The Court recognizes that it took double the population in the Dearborn PMA to achieve an equivalent number of segment registrations as the Troy PMA, a fact reflecting the lower demand for Nissan vehicles in the Dearborn PMA. (Tr. 11/17/11 at 25).  Although the absence of demand for the Nissan product could adversely affect the performance metric developed by the manufacturer, the analysis Nissan conducted accounted for this factor.  It measured performance by retail registrations, not population, and retail registrations are the most accurate and appropriate way of measuring opportunity within a market area because it tracks actual consumer behavior with respect to new vehicle purchasing.  (Tr. 9/19/11 at 95).  The advantage of reviewing actual competitive vehicle

18

registrations is that it removes the need to speculate about buyer behavior based upon population or other demographic data.  (Tr. 9/19/11 at 95).

<em>ii. Demographics</em>

The demographics in Superior's PMA are the worst in the metro Detroit Nissan market. (Tr. 9/9/11 at 59; Tr. 9/21/11 at 77).  The PMA has the lowest median household income, the lowest per capita income, and the lowest educational achievement measured by high school dropouts, college, masters, and PhD degrees.  (Tr. 11/15/11 at 66).  Its population is the least qualified by income and has the lowest number of qualified customers earning fifty to sixty thousand dollars, the segment most likely to be part of the foreign car market.  (Tr. 11/15/11 at 66).

In Superior's PMA, the majority of the block groups have median incomes less than $50,000.  The second block group in terms of ranking has median income between $50,000 and $74,000.  (Tr. 11/16/11 at 31; P 176).  Both experts agreed that an annual income of $35,000 is not representative of typical Nissan buyers.  (Tr. 11/16/11 at 79; Tr. 9/19/11 at 89).  The median Nissan buyer has a median household income of $75,000.  (TR. 9/19/11 at 88).  Further, expenditure data shows that residents in Superior's PMA spend less on vehicle purchases compared to residents of the other Detroit metro area Nissan dealers' primary market areas.  (Tr. 11/16/11 at 35).

In addition, Superior's market is challenged because of the diverse cultures and languages of the population within its PMA.  (Tr. 11/15/11 at 74; Tr. 11/21/11 at 15; Tr. 11/21/11 at 144).  Without question, the uniqueness of the demographics in Superior's PMA affects the shopping habits of the consumers.  (Tr. 11/15/11 at 70-71).  And to the extent those difference result in a "difference in the types of vehicles that are popular within the

19

PMA" is beyond the control of the dealer to adjust. . . ."  (Tr. 9/19/11 at 19).

The experts differed as to how to account for the demographic and socioeconomic factors such as income and education, the unique market given the domestic influence, and the shopping habits of the consumers.  Geckil testified that because every market is unique, comparisons are not "meaningful."  (Tr. 11/16/11 at 52).  He did not compare Superior's performance to any other dealer.

Nissan's evaluation accounted for the unique characteristics in a dealer's PMA through segment adjustment, which separates all vehicles models into groups or segments that are similar to each other in terms of size, price, and function, before calculating the expected sales for a dealer in its market.  (Tr. 9/7/11 at 93-4).  The segment adjustments, or product popularity, account for differences in income, age, and other demographic factors from one PMA to another.  (Tr. 9/19/11 at 23-25).  Consequently, Nissan applied an adjusted penetration average when it evaluated Superior's sales performance, which yielded a smaller percentage for Superior to achieve its sales penetration goal.  (Id.) Superior's performance does not improve based on this calculation.  (Tr. 9/19/11 at 32). (see e.g. Exhibit D 222, A-9--the 2007 product popularity in Dearborn PMA versus the North Central Region).  Therefore, the Court rejects testimony that the assigned PMA and/or demographics caused Superior's unsatisfactory sales performance.

### iii.  Domestic Influence

The domestic influence in the Detroit metro area is a special local marketing condition.  (Tr. 9/9/11 at 40, 58).  The witnesses were in agreement that the Detroit market is dominated by the Big Three, and unique as compared to the other markets in the North

Central Region.  (Tr. 11/17/11 at 8; 9/20/11 at 25; 9/8/11 at 36, 80; 9/12/11 at 26-27).  The auto industry is the predominant industry in Detroit and people are "tied into" the auto industry more so in Detroit than in other areas of the country. (Tr. 9/20/11 at 57).  Ford, GM, and Chrysler sell well above average in Detroit, (Tr. 9/20/11 at 55), and there are challenges in the City of Detroit for any auto manufacturer other than GM, Ford, and Chrysler.  (Tr. 9/20/11 at 54).  For example, in the metro Detroit area, the eight Metro Nissan dealers compete with 41 Ford dealers.  (Tr. 9/14/11 at 23; P 142).  Seven Ford dealers operate in the Dearborn PMA, (Tr. 9/12/11 at 37, 63), and nearly 38% of the vehicles sold in Superior's PMA are Fords.  (Tr. 11/15/11 at 59).  The North Central Region's low penetration is due in part to the presence of domestic manufacturers and plants in the Midwest, (Tr. 9/14/11 at 14; 9/20/11 at 24) and the availability of Big 3 employee discounts.  (Tr. 11/21/11 at 23-24).

Although the parties concede Ford may be a specialized factor, they disputed how to address the import of Ford Motor Company in the Dearborn PMA.  Farhat normalized for Ford registrations by reducing and/or removing the portion of the industry that is considered biased or unavailable.  Because the Ford brands achieve higher than state average levels of performance in Dearborn, those sales in excess of an average level are unavailable to any dealer but a Ford dealer.  (Tr. 9/19/11 at 64).  Therefore, the sales are removed to normalize the level of expectation.  (Id.)  For example, in "Michigan, Ford is 21.8 percent of the competitive set, and that is lower than Ford in Dearborn, [which] is 37.2, so normalization brings the 37.2 down to 21.8."  (Tr. 9/19/11 at 66).

The Court finds Farhat's analysis provided a proper basis for assessing Superior's

sales performance. Even after normalizing the Ford registrations, Superior's adjusted sales penetration placed it among the worst performers in Michigan. (D 222, A 38-44). In addition, when Farhat eliminated the Ford registrations from the competitive segment registrations, Superior remained a poor performer. (D 225, A-97). Finally, Farhat normalized all domestic registrations in the Dearborn PMA to a level equal to state average, the Superior's adjusted sales penetration remained among the worst. (D 220, A 45-51). Those dealers that performed worse than Superior are no longer Nissan dealers. (Tr. 9/19/11 at 72, 74-81). Moreover, the Domestic Normalized Analysis reveals that other Detroit Metro PMA's have a higher percentage of domestic registrations than the Dearborn PMA, which runs contrary to the argument advanced by Superior throughout this litigation. (See D 220, A 45, Tr. 9/19/11 at 75). Lastly, Farhat performed a sales penetration analysis that completely eliminated domestic brand vehicle registration from the competitive set. (D 225, A 92). Superior's adjusted sales performance was still below Metro, District, and State averages, and Nissan's assessment of Superior's performance was reasonable.

### iv.  Road Construction

From late 2003 through 2006, major road construction on Michigan avenue resulted in difficulty entering and leaving the dealership, excessive dirt, and a reduction in Superior's Buick GMC sales of 30%. (Tr. 11/18/11 at 133, 153; 9/22/11 at 33). Schwartz notified Nissan of the road construction, and DOMs were aware of the construction because they visited the dealership. (Tr. 11/18/11 at 144). Schwartz testified that GM offered Superior a special allocation of vehicles to recover from the road construction, but Nissan did not.

22

(Tr. 11/21/11 at 94; 9/16/11 at 37).  Although road construction on Michigan Avenue was advanced by Schwartz as a reason for poor sales, Farhat analyzed the average monthly volumes before, during, and after the Michigan Avenue road construction.  He testified that although new vehicles sales remained flat, used vehicle sales increased during road construction.  (D 222, A 80).  The analysis undercuts road construction as a basis for rejecting Nissan's assessment of Superior's sales effectiveness.

### 3.  Allocation

Underlying the claims alleged in their complaint is Plaintiffs' contention that Superior never received enough inventory to meet Nissan's sales standards.   The opening allocation of vehicles is important because it begins the "turn and earn" system by which Nissan supplied vehicles based on the dealer's sales.  The opening allocation is essential for a new dealer to establish a travel rate.  (Tr. 9/7/11 at 46).  Schwartz asserts that without inventory, Superior could not increase sales, and Superior was chronically undersupplied.

Supply was addressed in the Term Agreement, which governed the opening allocation.  The parties understood that:

> numerous factors [ ] affect the availability of Nissan Vehicles. . .including, without limitation, production capacity, sales potential in Dealer's and other Primary Market Areas, varying consumer demand, weather and transportation conditions, and state and federal government requirements. Since such factors may affect individual dealers differently, Seller reserves to itself sole discretion to distribute Nissan Vehicles in a fair and consistent manner, and its decision in such matters shall be final.

(D 10, § 7.A.1.)

According to Schwartz, Superior acquired thirty-six Nissan vehicles from Perkins;

23

Nissan puts the number at fifty-three.  (Tr. 9/15/11 at 144).     Although Schwartz expected an opening allocation of 200 to 250 vehicles, and he testified that other newly established Nissan dealers received substantial opening allocations, Schwartz was not opening a newly established Nissan dealership.  Nissan had no records dating back to 2001 documenting the vehicles it offered to Superior.  (Tr. 9/16/11 at 6).   Further, Schwartz conceded that he was not involved in ordering inventory, and Plaintiffs failed to present testimony from the employee that did order inventory.   Regardless of the parties' disagreement as to the number of vehicles at opening, it is undisputed that Superior had a seven month supply of vehicles based upon Perkins' prior historical sales rate, a supply in excess of the two month average for other dealers in the North Central Region.  (Tr. 9/16/11 at 34).

The Court does not find these numbers indicative of an inadequate opening supply. Notably, Schwartz never complained about his opening allocation until years later, when he received his NOT.  In addition, Lavrencik testified that the fifty-one supplemental cars received by Superior during its first six months of operation were part of its opening allocation.  (Tr. 9/16/11 at 34).  Notably, after Schwartz first raised opening allocation at a June 6, 2007, meeting, Nissan reviewed Superior's distribution complaints and found Superior had received vehicles in accordance with the Nissan distribution system.  (D 190, Tr. 9/16/11 at 11-13).

Without question, allocation is an important component of a dealer's ability to meet its sales goals.  Nissan uses a "Market Driven Allocation and Production System ("MAPS") that allows dealers to determine their own product need.  (Tr. 9/15/11 at 110).  Policy

24

Number 109 covers Regional Reserve Vehicles, and it allocates vehicles to the dealer that will run out of vehicles the soonest.  (Tr. 9/15/11 at 112-115).  Day supply, which is calculated based upon dealer inventory levels and sales history (Tr. 9/15/11 at 110-112), allows large and small dealers to be treated fairly because the system uniformly raises the day supply of all the dealers.  (Id. at 114).

Under MAPS, dealers have several vehicle ordering opportunities.  Pass One takes place preproduction and allows the dealer to customize the vehicle.  (Tr. 9/15/11 at 116).  Pass Two offers dealers the fastest moving vehicles in aggregate for the region.  (Id. at 117).  Dealers have less flexibility in terms of modification in Pass Two.  (Id. at 118).  Pass Two includes the leftovers from Pass One and additional vehicles.  (Id. at 119-120).  Both Pass One and Pass Two allocations are computer run and generated; Nissan has no ability to "manipulate" the distribution.  (Tr. 9/15/11 at 118).  Nissan provides dealers with a list of all vehicles available for purchase.  (Tr. 9/17/11 at 45; 9/15/11 at 116).  A dealer does not have to accept a particular vehicle; he can accept it as is, decline the vehicle, or modify the vehicle to specific market conditions and accept the modified vehicle.  (Tr. 9/15/11 at 116).  Dealers also have the opportunity to purchase vehicles declined by other Nissan dealers during Pass Two, which the DOMs offer as "Supplemental" vehicles.  (Tr. 9/15/11 at 132).  Finally, dealers can purchase vehicles from Additional Vehicle Request ("AVR") pools, which include vehicles available from other districts or regions.  (Tr. 9/15/11 at 138).

Nissan provided a chart tracking inventory levels and sales from February 2001 through December 2007.  (D 190).  The chart shows that for the most part, Superior's inventory exceeded its sales rate.  (Id.)  The chart shows that Superior's sales remained flat even when inventory levels rose.  (D 190).  According to Lavrencik, the inventory trend

25

had a positive slope showing distribution did not hinder sales. (Tr. 9/16/11 at 12).

Lavrenchik testified that Superior declined vehicles allocated as Pass One vehicles and Pass Two vehicles. Nissan also offered Superior additional vehicles, which Superior declined. (Tr. 9/13/11 at 36, 39, 40, 103). Nissan presented charts showing how many supplemental vehicles Superior declined throughout 2005-2007. (D 203). It is undisputed that Superior declined offered vehicles in Pass One of the allocation system, as well as Pass Two. It likewise is undisputed that Superior had the ability to purchase vehicles through supplemental and AVP pools during 2005 through 2007. (Tr. 9/16/11 at 21).

Schwartz offered a reasonable explanation for turndowns, and the Court finds no basis to discredit Schwartz' testimony that he could not get all the vehicles he wanted for his market. The record is replete with evidence that throughout the course of their relationship, Schwartz repeatedly asked for additional inventory. (Tr. 9/12/11 at 21, 101; 11/18/11 at 157; 11/21/11 at 13). Superior wanted high demand vehicles above and beyond what it had earned under MAPS. (Tr. 9/16/11 at 11-13). Specifically, Superior wanted more Altimas, its core product. (Tr. 11/21/11 at 13). Throughout the relationship, DOMs worked with Superior to offer high demand vehicles that became available. (Tr. 9/12/11 at 102; 9/13/11).

Schwartz testified that there were many times he only had a few Altima in stock. This was his core product and the vehicles had sixteen variations and six or seven color choices. (Tr. 11/18/11 at 157, 158). Even if Schwartz believed that he was chronically undersupplied, he never participated in training seminars on Nissan's allocation system. There is no record that anyone from Superior participated in the training. (Tr. 9/15/11 at

26

103).  Nor did Schwartz ever access the contact information provided to dealers in the event the dealer had questions.  (Tr. 9/15/11 at 109).

Further, there is no evidence that Superior did not receive the cars it earned under the distribution system.  Regional sales performance standards play no role in the MAPS allocation.  (Tr. 9/15/11 at 114).  Allocation systems are "dealer performance driven" not offer systems.  (Tr. 9/16/11 at 66).  Under the distribution system, dealers with above average days' supply will not receive additional vehicles until other dealers with lower days' supply receive allocations.  (Tr. 9/16/11 at 66).  Nevertheless, the Dealer Agreement governs allocation:  Nissan never promised to provide vehicles as requested by dealers. It reserved discretion to distribute vehicles in a fair and consistent manner, and Nissan did exactly that.  Accordingly, the distribution system played no role in Superior's sales performance because its inventory levels were consistently in excess of the standard industry target of sixty day supply.  (Tr. 9/21/11; D 222, A 68).

### 4. Cross-Sell

Nissan expects its dealers to capture a majority of Nissan sales registered in their own market areas.  (Tr. 9/8/11 at 96).  Typically a majority of consumers purchase vehicles from dealers located closest to them absent a reason to shop elsewhere.  Reasons to purchase elsewhere include bad reputation, ineffective marketing, poor customer treatment, and lack of competitive pricing.  (Tr. 9/19/11 at 105).

In June 2004, Superior captured only 31% of the new Nissan vehicles registered in the Dearborn PMA.  (D 76).  That means that consumers in Nissan's PMA purchased their new vehicles from dealerships other than Superior, a condition referred to as "pump

27

in."  Although Superior also sold vehicles to customers outside its assigned PMA, which is referred to as "pump out, " Superior's cross-sell percentage was well below the Detroit metro average.  (Id.)  This statistic shows that Superior was not an effective intra-brand competitor, even within its own area of geographic advantage.  (D 222, A 73-A 75).  In sum, dealers other than Superior, sold more Nissan vehicles in the Dearborn PMA than Superior.

Even though "pump in" and "pump out" sales are common in a metro area, (Tr. 11/16/11 at 70), and expected given the circumstances of Superior's market, (Tr. 11/16/11 at 71-73), it is an important metric.  Because cross-sell performance only considers actual Nissan vehicle registrations in the Dearborn PMA, it undermines Superior's contention that poor demographics resulted in poor sales performance.  Other operational deficiencies provide possible explanations for this deficiency.  (Tr. 9/19/11 at 160).  Farhat concluded that the poor performance could be attributed to Superior's advertising, pricing, facility, service approach, personnel, and focus on business other than Nissan new vehicle sales. (Tr. 9/19/11 at 105).

For example, Superior decreased its annual Nissan advertising during 2004 to 2007, from $226,353 to $163,267 (D 222, A 81; Tr. 9/19/11 at 108-09), but increased its used vehicle advertising costs from $216,379 to $577,076.  (Id.)  In addition, Superior ran Nissan ads below its prominently displayed GM's ads, despite complaints by the DOMs. (Tr. 9/7/11 at 104; 9/9/11 at 133; 9/13/11 at 52; 9/14/11 at 5).  According to Schwartz, he had no understanding of PMA when he purchased the dealership in 2000.  He testified that he has a natural market that he tries to reach through advertising.  (Tr. 11/18/11 at 136).

28

Although there was evidence presented that Plaintiffs advertised to the Arabic population that resided in the Dearborn PMA, there was no evidence of targeted advertising to consumers in the Taylor/Southgate area.  (Id.)

Testimony at trial showed that Superior's average gross profit per new retail unit exceeded the average profit for other Detroit Metro Nissan dealers.  (D 248A; Tr. 9/19/11 at 110-114; 11/12/11 at 42).

The DOMs testified that Schwartz dragged his feet in accomplishing facility improvements.  (Tr. 9/9/11 at 82, 105, D 27-29).  Throughout the relationship, Nissan wanted the dealership to conform to the Nissan Retail Environment Design Initiative (NREDI)–its program to implement a consistent facility image for all dealership.  (Tr. 9/9/11 at 134).  Yet, Schwartz did not offer to complete the NREDI program until October 2007, while the dealership was under the NOT.  (P 62).  In addition, Nissan customers had to finalize their vehicle purchases at the GM facility.  (D 9).

In addition, Superior had a history of poor customer service (D 57; Tr. 9/12/11 at 104) as reflected by the Customer Satisfaction index ("CSI") surveys.   Superior also had turnover in its sales manager position and untrained sales staff.  (Tr. 9/12/11 at 94; 9/12/11 at 95; 9/12/11 at 124-130, 132-34; D 70, D 81).   Finally, Schwartz was focused on business other than Nissan throughout the relationship.  He conceded he initially was busy with GM business, and that he turned his focus to used cars in 2004. Schwartz testified that at that time, he dedicated resources to his used car department because it is easier to control used car inventory.  He also hired a used car manager.  (Tr. 11/17/12 at 118, 142).

29

### 5. Relocation

In 2006 Nissan initiated a market study of the Detroit Metro, and the results were reviewed in person with Schwartz in March 2007. (D 163, Tr. 9/15/11 at 61). One of the recommendations was that the preferred location for the dealership was at Telegraph and Michigan Avenue, closer to competitive dealerships. (Id.) Nissan followed up the conversation with a letter sent to Superior stating that Nissan had the contractual right to condition approval of any sale or transfer of the dealership on a proposed buyer's or transferee's commitment to upgrade and/or relocate the dealership in conformance with the 2006-2007 market study. (D 165; Tr. 9/15/11 at 59). Under § 15 of the Dealer Agreement:

> If [Nissan] has recommended, pursuant to a market study conducted in accordance with Section 4.A, that Dealer relocate its Dealership facilities, [Nissan] may offer to the proposed dealer a Term Sales & Service Agreement subject to the condition that its Dealership Facilities shall be relocated within a reasonable time to a location and in facilities acceptable to [Nissan] and in accordance with market study recommendations.

(D 48 § 15.B). In addition, Nissan has sixty days to assess whether to consent to a buy-sell proposal. (Id.)

Schwartz testified that this condition rendered his dealership "unsellable." (Tr. 11/21/11 at 117-118). Schwartz has not presented any buy-sell agreement to Nissan. (Tr. 9/14/11 at 115). Nor did Plaintiffs present any evidence that the NOT was merely a means for forcing Superior to relocate.

## III. CONCLUSIONS OF LAW

### A. Michigan Dealer Act

30

Nissan bears the burden to show that it acted in good faith, that it complied with the notice requirements, and that there was good cause for the termination of the Dealer Agreement.

Under Michigan Compiled Laws § 445.1567(1),

(1) Notwithstanding any agreement, a manufacturer or distributor shall not [terminate] any dealer agreement with a new motor vehicle dealer unless the manufacturer or distributor has complied with all of the following:

    (a) Satisfied the notice requirement of section 10 [445.1570].

    (b) Acted in good faith.

    (c) Has good cause for the cancellation, termination, nonrenewal, or discontinuance.

The facts show that Nissan satisfied the statutory requirements.

### 1. Notice

The statute requires that the notice of termination be made more than ninety days prior to the effective date of the termination, that it was sent by certified mail, that it contain a statement of intention to terminate; and that it include a statement of the reasons for the termination, and that it specify the date upon which the termination will take effect.  Mich. Comp. Laws § 445.1570.  Nissan's NOT complied.

First, the NOT identified itself as a "Notice of Termination Pursuant to the Nissan Dealer Term Sales and Service Agreement and Michigan Complied Laws § 445.1567(3)(a)-(d)."  It stated that Nissan was giving notice of its intent to terminate effective March 10, 2008, or ninety days from receipt of the notice, whichever occurred later.  (D 184).  It was sent by certified mail on December 4, 2007, more than ninety days prior to March 10, 2008.  And, lastly, the NOD provided a reason–"failure to actively and

31

effectively promote the sale of new Nissan vehicles in the Dearborn PMA."  (D 184).

### 2.  Good Cause

The Court assesses whether Nissan had good cause for the termination and acted in good faith based on the facts that existed prior to or on the date of the Notice of Termination–December 4, 2007.  Superior's performance after that date plays no role in the assessment.  The Notice of Termination clearly states that the termination is due to unsatisfactory sales performance.

The good cause provision in § 445.1567(1)(c), is defined in § 445.1567(3):

> (3) If the failure by the new motor vehicle dealer to comply with a provision of the dealer agreement relates to the performance of the new motor vehicle dealer in sales or service, good cause shall exist for the purposes of a termination, cancellation, nonrenewal, or discontinuance under subsection (1) when the new motor vehicle dealer fails to effectively carry out the performance provisions of the dealer agreement if all of the following have occurred:
>
>> (a) The new motor vehicle dealer was given written notice by the manufacturer. . . of the failure.
>>
>> (b) The notification stated that the notice of failure of performance was provided pursuant to this Act.
>>
>> (c) The new motor vehicle dealer was afforded a reasonable opportunity to exert good faith efforts to carry out the dealer agreement.
>>
>> (d) The failure continued for more than 180 days after the date notification was given pursuant to subdivision (a).

Here, Nissan satisfied the notice requirements.  Further, Nissan has shown by the preponderance of evidence that it had good cause for the termination because Superior failed to carry out its contractual obligation to "actively and effectively promote through its own advertising and sales promotion activities" the sale of Nissan vehicles in the Dearborn

PMA.  Nissan measured Superior's sales penetration using a metric employed by many automobile manufacturers.  Specifically, Nissan used the North Central Region average as its baseline benchmark for measuring sales penetration effectiveness.  Nissan compared Superior's performance to other dealers in the state and Detroit metro market. Superior's sales penetration consistently ranked last or second to last among Nissan dealers in the Detroit Metro market, Michigan, District 12, and the North Central Region. The dealers that underperformed Superior are no longer in business.

The Court finds that Nissan's methodology, although perhaps not perfect, is reasonable.  See Fred Laverly Co. v. Nissan North America, Inc., No. 99-76065 at *25-27 (E. D. Mich. Dec. 17, 2007), aff'd No. 03-1005, 2004 WL 1041604 (6th Cir. May 4, 2004); see also Gallo Motor Ctr Corp. v. Mazda Motor of America, Inc., 204 F. Supp. 2d 144, 152 (D. Mass. 2002) (noting that the issue was not dependent on raw sales but on dealer performance relative to the business available in its market area).  The use of a regional benchmark controls to great extent for economic and marketing conditions and allows segment adjustment for context as to how a dealer is performing.  It also accounts for unique consumer characteristics in a particular market.  Therefore, although Superior faced challenges in selling Nissan vehicles in a domestic auto market, Nissan considered the domestic influence in assessing Superior's performance.  Further, the reasonableness of the methodology is supported by the fact the assessment is not contradicted by other measurements.  For example, cross-sell reports showed a majority of consumers residing in the Dearborn PMA traveled to other dealers to purchase and service their Nissan vehicles.  Factors, within Superior's control impacted its ability to sell cars, including a

33

focus on its GM business and used car sales, pricing, and failure to upgrade the dealership facility to make it competitive with other dealerships in the Dearborn PMA.

The Court does not find that yearly raw sales volume adequately measures performance. That measurement favors larger dealerships in densely populated urban areas over smaller rural dealerships. Therefore, the Court rejects it as an alternate basis for assessing the existence of good cause.

Next, the Court finds that Nissan gave Superior a reasonable opportunity to carry out its obligations under the Dealer Agreement; it provided Superior a 180-day cure period, in which Superior's performance declined as measured by RSE. Despite the performance problems, Nissan twice extended the NOD Cure Period for 180 days. Although Superior had over two years to improve its performance, it failed to so. Superior's RSE continued to rank at the bottom, a factor that satisfies subsection (d). Accordingly, the Court concludes that Nissan met each and every requirement under § 445.1567(3), and had good cause to terminate Superior.

### 3. Good Faith

Under the Michigan Dealer Act, "good faith. . .means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mich. Comp. Laws §§ 445.1567(1), 440.2103. The issue of good faith "is ordinarily 'a matter of factual weighing' for the district court in a bench trial." Fred Lavery Co., 2004 WL 1041604 at *5.

The evidence presented at trial showed that Nissan investigated Superior's claims of domestic bias; DOMs worked with Superior to improve its performance; and Nissan

34

twice extended the 180-day cure period.  During the two year period Superior operated under a NOD, DOMS offered Plaintiffs information as to how to improve operations.

The Court rejects Plaintiffs' claim that the termination resulted from Nissan's desire to force a relocation of the dealership.  Nissan's concern with Superior's performance was ongoing and arose before the NOD.  Moreover, the NOD came before the 2006-2007 Market Study relocation recommendation.  Although the NOT was issued after the relocation recommendation, the record is clear--Nissan had concerns about Superior's sales performance as early as 2004, and it gave a consistent message to Superior throughout the parties' relationship.  Superior offered no evidence other than the relocation recommendation itself to suggest an absence of good faith.  The relocation recommendation was issued in the ordinary course of business.  There is no evidence that "relocation" was part of Nissan's plan in 2001, inasmuch as the earlier market study merely recommended an upgrade to the facility at the current location.

Similarly, there is no basis for concluding that the changes made to Superior's PMA resulted from bad faith.  First and foremost, the initial change to the PMA occurred before the parties entered into the operative Dealer Agreement.  When Superior signed the Dealer Agreement in 2003, Plaintiffs accepted the obligation to actively and effectively represent Nissan in the expanded Dearborn PMA.  There is no evidence showing that Nissan believed that the increased PMA would lead to Superior's downfall. The expansion was not unreasonable.  The census tracts were assigned in accordance with business practices.

Therefore, the Court concludes that Nissan acted in good faith during the course

of its relationship with Superior.  The Court's finding undermines Plaintiffs' claim that Nissan violated other provisions of the Act.  Sections 445.1573 and 445.1574 govern prohibited conduct by manufacturers.  After reviewing the evidence, the Court finds no violations.

Specifically, the Act prohibits a manufacturer from adopting, changing, establishing or implementing an allocation and distribution system for new motor vehicle dealers that is "arbitrary or capricious or based on unreasonable sales and service standards."  Mich. Comp. Laws  § 445.1574(1)(a).  The Court holds Nissan did not violate this provision.

Nissan complied at all times with its own Sales Distribution Policy and Procedures. At the beginning of the parties' relationship, Nissan provided an opening allocation of vehicles to Superior, and continued to allocate vehicles in accordance with its allocation system throughout the relationship.  On numerous occasions, DOMs made the first offer of extra allocation to Superior.  Nissan's allocation system provided Superior with an adequate inventory, and Nissan exercised its discretion reasonably.  Without question, Nissan worked to assist Superior to achieve substantial improvement in its sales performance.

Plaintiffs' position is that Nissan applied the sales performance standards and allocation system in a way so as to create a pretext for termination.  The evidence does not support Plaintiffs' theory, and Nissan's notice to Superior that it failed to achieve RSE was not pretextual.  Nissan's demand that Superior achieve RSE was not coercive.  Here, the Court rejects Plaintiffs' claim that Nissan's ulterior motive was to terminate Superior's franchise to relocate to the preferred location at Michigan and Telegraph without

compensation to Superior. There is no concrete evidence to support this theory.

Although Nissan set high goals for performance, it worked with its dealers to meet those goals.  Throughout the relationship, Schwartz placed a higher value on his own experience and beliefs regarding good business practices in his market area than on what Nissan asked Superior to do.  His disagreement does not render Nissan's evaluation unreasonable.  The fact that Superior could not reach Nissan's target goal for number of sales does not render the goal unreasonable.  RSE merely set an average, and many Nissan dealers exceeded RSE and many dealers failed to meet RSE.

In addition, Plaintiffs contend that Nissan violated § 445.1573(g), which prohibits a manufacturer from requiring a dealer to change the location of the dealership or making substantial alterations to the dealership premises if it would be unreasonable to do so. Mich. Comp. Laws § 445.1574(g).  Nissan sent the same form letter it sends to any dealer when a market study recommends relocation.  The letter reminded Superior that Nissan had the contractual right to condition approval of any sale or transfer of the dealership on a commitment to upgrade or relocate the dealership.  The fact that real estate prices in  the preferred location are high does not render the requirement unreasonable.  This is not the situation where the dealership underwent expensive upgrades only to be instructed to relocate.  Nissan met its burden of proof to show its complaints about sales performance were not a pretext to avoid the statutory prohibition against forcing dealers to relocate or unseasonably withholding consent to a sale or unfairly preventing the dealer from receiving reasonable compensation for the value of his dealership.  The inclusion of the right in the Dealer Agreement supports an essential, legitimate business objective–to ensure that

dealers are located to best serve the public.  Salco Corp. V. General Motors Corp., 517 F.2d 567 (10th Cir. 1975).  Consequently, the recommendation does not violate § 445.1574(1)(m), which prohibits a manufacturer from "[u]nfairly prevent[ing]" a new motor vehicle dealer "from receiving reasonable compensation for the value" of the dealership. In sum, the Court concludes that Nissan complied with state statutory law.

### B. Dealer Day in Court Act

An automotive dealer may bring suit under the Dealer Day in Court Act ("DDCA"), 15 U.S.C. § 1222, against "any automobile manufacturer" to recover damages sustained by reason of the manufacturer's failure to act in good faith in performing the terms of the franchise.  The Dealer Day in Court Act defines good faith as the duty "to act in a fair and equitable manner. . .so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party[.]" 15 U.S.C. § 1221(e).  This is "a quite restrictive definition," Overseas Motors, Inc. v. Import Motors Ltd., Inc., 519 F.2d 119, 124 (6th Cir. 1975), and, hence, "[i]n the absence of coercion, intimidation, or threats thereof, there can be no recovery."  Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.3d 683, 685 (6th Cir. 1976).

A mere lack of fairness will not satisfy the statute.  Id.  "Coercion must include a wrongful demand which will result in sanctions if not complied with."  Id. (internal punctuation and citations omitted).  Although insistence that the dealer comply with a reasonable obligation imposed by the franchise agreement does not constitute a wrongful demand, "[a] demand is wrongful if it pressures the dealer into taking an action it would not take otherwise,. . .or impels the dealer into forfeiting its rights under the dealer

agreement[.]"  General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 326 (3d Cir. 2001).

Because Nissan has advanced " an objectively valid reason for its actions," Plaintiffs cannot prevail without evidence of an ulterior motive."  Id.  "This is not to say, however, that a manufacturer who chooses to terminate a dealer can immunize itself from DDCA liability by simply pointing to a franchise agreement provision with which the dealer ostensibly failed to comply and assert that such provision was the basis for its severance of the franchise relationship."  Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 326-27 (3d Cir. 2001).

Here, Plaintiffs did not meet their burden of proof and cannot prevail under the DDCA.  This is not a situation where Nissan's termination was pretextual.  It acted in good faith as demonstrated by the facts found by this Court.  Plaintiffs' claim goes beyond an assertion that Nissan administered the allocation system in a manner that failed to supply Superior with high demand cars to force termination.  Plaintiffs' position is that Nissan applied the sales performance standards and allocation system in a way so as to create a pretext for termination.   Nissan's notice to Superior that it failed to achieve RSE was not pretextual.  Nissan's demand that Superior achieve RSE was not coercive.  Here, the Court rejects Plaintiffs' claim that Nissan's ulterior motive was to terminate Superior's franchise to relocate to the preferred location at Michigan and Telegraph without compensation to Superior. Again, Plaintiffs advanced no concrete evidence to support this theory.

Consequently, Nissan's insistence that Superior adhere to its franchise obligations did not constitute a wrongful, sanction-backed demand for the reasons discussed in the

context of good faith relative to the state claim.  In sum, the evidence at trial shows that Nissan worked with Superior to improve its sales; that Superior rejected suggestions from the DOMs regarding dealer operations; and that Nissan carefully considered reasons outside dealer operations as they were raised by Superior to justify poor performance.  At all times, Nissan complied with the polices regarding market studies.  Plaintiffs failed to advance sufficient evidence for the Court to hold that Nissan acted in bad faith in meeting the terms of the parties' agreement.

### C.  Breach of Contract

On March 10, 2003, the parties executed a standard Nisan Dealer Sales & Service Agreement, which is the operative agreement governing this dispute.  Pursuant to 12B.(1)(a) of the Dealer Agreement, Nissan may terminate if Superior "fail[ed] to substantially fulfill its responsibilities with respect to . . .[s]ales of new Nissan vehicles and other responsibilities."  D48.  The Dealer Agreement also covers what happens when a dealer materially breaches it contractual sale performance obligations.  The Dealer Agreement requires Superior to demonstrate "substantial progress" during the cure period to avoid Nissan exercising the right to terminate their agreement.  (D 48).

Plaintiffs' claim that Nissan breached the Dealer Agreement when it terminated Superior is assessed under California law.  Section 17.F of the Dealer Agreement contains a California choice of law provision.  (D 48).  The essential elements of a breach of contract claim are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  Reichert v. General Ins. Co. of Am., 442 P.2d 377, 381 (Cal. 1968).

The Court concludes that Superior failed to perform its obligations under the Dealer

40

Agreement, and the excuse for nonperformance is inadequate.  Nissan held Superior to the same sales performance standard it held every other dealer.   Under the   RSE measurement Superior's sales performance lagged behind every other dealer.  Nissan complied with its contractual obligations to Superior as set forth in the Dealer Agreement. It also considered the additional criteria, as set forth in Section 3.3D of the Dealer Agreement.  Nissan's evaluation took into account the impact of local marketing conditions, general shopping habits of the public, and the availability of vehicles to the dealer.  In sum, Nissan afforded Superior every opportunity to meet its obligations under the Dealer Agreement.  Superior failed to do so.

## IV.  CONCLUSION

For the reasons stated, the Court holds that Nissan did not violate the Michigan Dealer Act or the DDCA.  Nor did Nissan breach the Dealer Agreement.  Plaintiffs are not entitled to relief on any of their claims.

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: March 30, 2012

41

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date a copy of this Opinion and Order was served

upon all Counsel of Record via the Court's ECF Filing System.

<u>s/Bernadette M. Thebolt</u>

Case Manager

**CERTIFICATE OF SERVICE**

Copies of this Opinion and Order were mailed and/or electronically filed to counsel of record

on this date.

_____
Case Manager